**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RUFUS GRAYER, NAOMI GRAYER, )
DARIS WILLIAMS, TASHA R. GRAYER, and )
JANET D. RICHARDSON )
)
Plaintiffs, )
)
)
) No. 06 C 1997
v. )
) Judge John A. Nordberg
DAVID GREENWOOD, JOSHUA PURKISS, )
JOHN LUCID, LAZARO ALMAMIRANO, )
CHAD C. BAUMAN, ZACHARY A. )
CUATCHON, EDWARD DENK, VICTORIA )
GUTIERREZ, EDWARD LANGLE, JOHN R. )
MAPLES, JR., NINA MOORE, CORRY )
WILLIAMS, and CITY OF CHICAGO )
)
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

This is a Section 1983 action with pendant state law claims. Plaintiffs seek damages for a warrantless search of their first floor apartment and for being detained for an hour to an hour and a half while police executed a search of the second floor apartment in the same building. Plaintiffs raise other related claims, complaining (among other things) about the scope of the search and the amount of time officers had guns drawn upon entering the first floor apartment. Plaintiff Janet Richardson asserts claims about her arrest made by police after they found what they believed were illegally copied DVDs being sold by Richardson out of the second floor

apartment. Defendants move for summary judgment on all the federal claims. For reasons explained below, the motion is granted.

## FACTS

At the time of these events, plaintiffs Naomi and Rufus Grayer owned an apartment building at 3340 West Douglas Boulevard in Chicago. The building has three apartments -- one on the first and second floors and one in the basement. Rufus and Naomi were living in the first floor apartment along with their son Levarus Grayer and Naomi's godson, Daris Williams. One of their adult daughters, Janet Richardson, was living on the second floor.[1] The basement apartment was occupied by another adult daugher, Tasha Grayer, who lived there with her son. No one else lived in the building. In sum, it was a family-owned and family-occupied building.

A few days before November 5, 2005, an informant told police officers working on a Chicago gun task force that he had been in the second floor apartment with Levarus and that Levarus had two handguns. Police knew that Levarus was a convicted felon and a suspected gang member and that he also had been arrested for a number of violent offenses. They also learned that Levarus had previously identified 3340 West Douglas as his address. The police sought a search warrant. The informant appeared before the Magistrate Judge who, after questioning, found probable cause existed for a search of the person of Levarus Grayer and the second floor apartment. The warrant sought a 9 mm semi-automatic handgun and a .38 caliber revolver.

---

[1] Previously Janet had been living in the first floor apartment and Levarus was on the second floor, but they switched apartments approximately five months before these events.

On November 5, 2005, after a strategy meeting to plan how the search would be conducted and after viewing pictures of Levarus Grayer, officers proceeded to 3340 West Douglas in several cars. It was in the middle of the afternoon. As they arrived, several officers went to the back of the building to secure the rear exits.

The parties dispute what happened next. Under the defendants' version, several officers recognized Levarus standing on the front porch. When he saw the officers, he fled into the building and into the first floor apartment. The officers rushed in and began knocking on the first floor door. Janet Richardson showed up as they were knocking.

Plaintiffs's version ends up at the same point, with Janet and the officers standing outside the door, but gets there in a completely different way. Plaintiffs deny that Levarus had been standing outside and assert that he had been in the house the whole time, watching tv for the previous three hours in his bedroom. Plaintiffs claim that officers entered the building and went immediately up the stairs to the second floor apartment. Janet Richardson had been sitting in the first floor apartment reading at the dining room table. She heard the footsteps going upstairs and went out of the first floor apartment and up the stairs to investigate. She met officers on the stairs and saw others inside the second floor apartment. The officers told her they were executing a search warrant for Levarus Grayer and a gun and asked Richardson if she knew where he was. She said he was inside the first floor apartment. The officers ran down to the first floor apartment door with Richardson following behind.

At this point, the two versions merge with officers knocking at the door and saying "it's the police, let [us] in." (Ex. 2 at 47.) The officers asked Janet if she would let them in the apartment. She said she couldn't because she had left her "set of keys" on the dining room table.

(*Id.* at 48.)[2] The officers continued to knock. Inside the apartment Tasha Grayer was sitting at the dining room table reading. She heard the knocking but did not move to open the door. (Ex. 5 at 46.) Levarus was watching tv. Naomi and Rufus were also somewhere inside the apartment. Hearing no response, and after knocking for what "seem[ed] like minutes" according to Janet Richardson (Ex. 2 at 46), the officers used a battering ram to break open the door.

The officers entered with guns drawn. Plaintiffs describe the scene as "chaos." Naomi Grayer was screaming. According to the officers, they holstered their guns within seconds after entering. Plaintiffs dispute this, asserting that it took officers three minutes to find Levarus in the back bedroom and arguing that it would be "reasonable to believe" that they would have kept their guns out until they found him. (Pl. Resp. to Defs. Fact No. 65.)

Officer Purkiss performed what defendants describe as a protective sweep around the area where they found Levarus Grayer. Plaintiffs argue that the search was broader and that the officers "trashed" the apartment by throwing clothes about the rooms, opening drawers in dressers, and moving mattresses. Rufus Grayer claims that money was missing from a pair of his pants in the bedroom and believes one of the officers must have stolen the money.

After securing the premises, the officers brought everyone into the front of the apartment. Levarus and Rufus were put in handcuffs. Defendants assert that the handcuffs on Rufus were removed "shortly thereafter," although plaintiffs claim that the handcuffs remained on for "about a half hour."

---

[2]Plaintiffs now claim that, although Richardson was "unable" to open the door because she did not have her set of keys, she was not "unwilling" to open it. (Pls. Resp. to Def. Fact Nos. 53-54.) The implication is that she would have voluntarily opened the door if she had only remembered to bring her keys with her.

Other officers returned to searching the second floor apartment. No handguns were found, but officers did find a bundle of approximately 250 reproduced DVDs, which seemed to include multiple copies of the same titles with some of them having handwritten labels on them. Some DVDs were labeled with names of movies still in the theater at the time.

Based on these facts and others, the officers arrested Janet Richardson. But she was never convicted of any offense relating to these events nor did she have a trial. However, Richardson at this time was employed as a fingerprint technician for the City of Chicago. During the second floor search, the officers found four pages of official police documents, which led to Richardson later being dismissed after an administrative hearing because she was found to have violated Police Department rules for, among other things, keeping police documents at her residence without permission.

## **ANALYSIS**

As both sides agree, the central issue is the legality of the first floor search. The warrant was only for a search of the second floor apartment. The question then is whether officers were justified under an exception to the warrant requirement. Plaintiffs describe this issue as the "core" issue of this case and one that "largely determines" all the other issues. It is, then, an obvious starting point for our analysis. We will address it in Section I, and then address the remaining claims in Section II.

**I.      Search of the First Floor Apartment.**

Defendants rely on two exceptions. First they argue they had exigent circumstances to enter the first floor apartment because numerous officers witnessed Levarus Grayer run from the front porch into that apartment. Alternatively, they argue that they had a right to conduct a

limited search, under the Supreme Court's decision in *Maryland v. Buie*, 494 U.S. 325 (1990), to ensure that the first floor apartment would not be used as a place to launch an ambush attack on officers while they searched the second floor apartment.

As to the first exception, plaintiffs complain that it relies on defendants' version of facts and is thus not a proper argument for a summary judgment motion. We agree. Therefore, the exigent circumstances exception is not available now, and we will only analyze the second exception and will do so based on plaintiff's version of facts, which means that the officers first began searching the second floor and only diverted to the first floor after being told by Janet that her brother Levarus was inside that apartment.

In analyzing this second exception (as well as the other arguments in this case), we do so through the lens of the qualified immunity doctrine. The purpose of this doctrine is to "to protect public officials from guessing about constitutional developments at their peril." *Gonzalez v. City of Elgin,* 578 F.3d 526, 540 (7th Cir. 2009). Traditionally, courts have looked at the immunity question by first asking whether, after construing the facts in a light most favorable to plaintiff, the defendants violated a constitutional right. Then, only if that question was answered yes would courts analyze the broader question of whether the particular right was "clearly established" at the time of the alleged violation. *Id.* However recently, the Supreme Court has held that a court may proceed directly to the second question without answering the first. *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009). We find this approach makes sense here.

The burden of showing that the constitutional right was clearly established rests with plaintiffs. *Gonzalez*, 578 F.3d at 540. More specifically, plaintiffs must point to "a clearly analogous case establishing a right to be free from the specific conduct at issue" or must show

that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Id.* (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir.2001)).

Plaintiffs do not attempt to argue that the alleged violations here fit within the "so egregious" prong. They must therefore point to a specific case to show that the conduct of these officers was clearly illegal. As explained below, we find they have not met their burden.

Defendants rely on the protective sweep rational set forth in *Buie*. This doctrine allows a limited search of adjacent areas to protect officer safety by preventing a possible ambush attack while an arrest is taking place. *Buie*, 494 U.S. at 333. Part of the justification is that officers going into a person's home are put "at the disadvantage of being on the adversary's 'turf.'" *Id.* The *Buie* court described two scenarios, with two different standards. It first stated that officers may search "immediately adjoining" areas from which an attack could be launched. *Id.* at 334. This search is allowed "as a precautionary matter and without probable cause or reasonable suspicion." *Id.* The *Buie* court held that a broader search of adjacent areas may be conducted if the officers have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing the area to be swept harbors an individual posing a danger" to those on the scene. *Id.*

Defendants argue both scenarios are applicable. The first scenario applies, they argue, because the first floor apartment could be considered an "immediately adjoining area" from which an attack could be launched. Defendants recognize that the area is a separate apartment in a building rather than being merely a closet or a separate room in a single apartment. But they argue that it is more analogous to the latter scenarios in that this was a family-occupied building

where family members intermingled among the separate apartments and generally treated it as a joint living space. For example, on the day of the search, several family members who did not live in the first floor apartment had been hanging out there for an extended period in the morning. Janet Richardson, who lived on the second floor, was on the first floor when police arrived and got up and left to check on things on the second floor without taking her keys.[3] Janet and Levarus had recently switched apartments.

Alternatively, defendants argue that the search was justified under the broader prong of the *Buie* doctrine. The officers had facts from which they could conclude that a dangerous person (*i.e.* Levarus Grayer) was inside the first floor apartment. It was more than an inference. Officers had strong evidence. Janet, his sister, told them she had just come from that apartment and her brother was inside. Levarus was believed, upon credible information, to have two handguns. There were access points from this first floor apartment to the second floor apartment from both the front and the back.

Before considering whether plaintiffs have pointed to a case clearly establishing these two exceptions cannot apply, we first address two preliminary objections about the general applicability of the *Buie* protective sweep doctrine. Plaintiffs first argue that the *Buie* doctrine only applies when the officers are making an arrest and not where, as here, they are executing a search warrant. Defendants respond, by pointing to numerous cases, from the Seventh Circuit and other circuits, holding that *Buie* is not limited to arrest warrants. *See, e.g., Leaf v. Shelnutt*, 400 F.3d 1070, 1087-88 (7th Cir. 2005) ("it was not necessary for the officers to have made an

---

[3]Her statement that she forgot her keys implies that she regularly had a key to the first floor apartment.

arrest in order for their search of the apartment to be justified [under *Buie*]").[4] The *Leaf* case appears dispositive as the Seventh Circuit explicitly rejected the same argument plaintiffs make here. Plaintiffs' only rejoinder is to cite to the Seventh Circuit's later decision in *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 627-28 (7th Cir. 2008). But this decision, which by the way was issued after the events in question, does not even address this specific argument, nor analyze the *Leaf* decision, much less overrule it.

Plaintiff's second preliminary argument is that the protective sweep rationale is a lawyer-created argument and not one the officers in this case specifically mentioned as the basis for conducting the search. This argument also fails. As an initial matter, the subjective intention of the officers is irrelevant. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006). The relevant inquiry is an objective one. *Id.* Even if subjective intent were relevant, plaintiff's argument would still fail because the factual premise is not supported by the evidence. Specifically, Officer Purkiss, the lead officer on the search, stated in his deposition:

> A. We **made safe the first floor apartment.** There was an apartment above us. We can't just leave – which is also our search warrant apartment – We don't know who's in there, so we have to make sure there's no one up there either. Officer safety is paramount; it's the first thing.
>
> \* \* \*
>
> A. . . .We went to the first floor to **clear it.**
>
> Q. What do you mean by "clear it"?

---

[4] *See generally*, Leslie A. O'Brien, "Finding A Reasonable Approach To The Extensions Of The Protective Sweep Doctrine In Non-Arrest Situations," 82 *New York Univ. L. Rev.* 1139, 1156 (Oct. 2007) ("The majority of circuits have extended the *Buie* protective sweep doctrine to situations where officers have lawfully entered a home for reasons other than an arrest.").

A. To make sure no one else was in there.

(Ex. 7 at 114-15; emphasis added.)

We now return to the immunity question. Have plaintiffs pointed to a specific case clearly establishing that a search, in light of these facts, is illegal under both prongs of *Buie*? Again, under *Pearson*, the question we are addressing is only whether it was "clearly established" that such a search would be illegal. We need not answer for certain whether this search would be illegal, nor must we ascertain what is the exact outer reach of *Buie*.

After reviewing the cases relied upon by plaintiffs, cited at pages 13 to 15 of their response brief, we find that plaintiffs have not met their burden. Plaintiffs cite to *U.S. v. Butler*, 71 F.3d 243, 248 (7th Cir. 1995) for the general proposition that police officers getting a search warrant must establish probable cause for each separate "dwelling unit" in a multi-unit building. While true, this case involves a different situation where officers were confronted with new information (the presence of Levarus Grayer inside the first floor apartment) upon arriving at the building. They did not intend to search the first floor apartment when they got the warrant nor even initially when they pulled up to the building. Under plaintiffs' version of facts, the officers bypassed the first floor apartment and went to the second floor apartment and began the search there. They only backtracked to the first floor when Janet Richardson told them that Levarus was inside the first floor apartment. This is therefore not a situation where police chose to randomly break into all the nearby apartments based on a generalized fear that an ambush theoretically could be launched from one of them.

Plaintiffs also rely on *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000). This case, which is probably plaintiffs' best case, nonetheless differs factually in significant ways. The

Seventh Circuit explained in *Jacobs* that the building was *not* a family residence and that there was no indication that the target of the search (a man named Troy) had any connection to the apartment ultimately searched. After police first searched a ground floor apartment, they were specifically told by the owner of the building that "no one named Troy lived in the building." *Id.* at 764, 771. In contrast here, this was a family building and officers received highly credible information that Levarus was in the first floor apartment.

Finally, it is worth considering the Seventh Circuit's decision in *Peals*, a case plaintiffs cited in their brief to support the argument that *Buie* doctrine is limited to arrest warrants. In *Peals*, the Seventh Circuit affirmed summary judgment for the police officers, finding that the officers who arrested the plaintiff in his garage were entitled to go into his house to conduct a *Buie* search. 535 F.3d at 628. The Seventh Circuit held this decision was justified under the more lenient first prong of *Buie*. *Id.* That is, the officers were justified in going from the garage into the house even without having any articulable facts to justify the broader search and even when they had already taken the plaintiff into custody. *Id.*

## II. Remaining Claims.

Plaintiffs' remaining claims, though numerous, collectively receive much less attention than the search issue which plaintiffs referred to as the core and determinative issue in the case. In their response brief, plaintiffs explicitly drop some claims (*see, e.g.* Counts III and VI) and implicitly drop others by either failing to address them or by offering only a cursory and undeveloped argument.[5] After having carefully read the briefs and supporting exhibits, we

---

[5]As plaintiffs themselves note in their response brief, the Seventh Circuit has stated that perfunctory and undeveloped arguments are waived; that the specific facts supporting a legal argument must be properly identified; and that a court need not scour the record to locate

agree with the arguments and authorities cited in defendants' opening and reply briefs and grant summary judgment to defendants on the remaining federal claims. Below we discuss the more significant arguments raised by plaintiffs in their response brief.

**Warrant For the Second Floor Apartment.** Plaintiffs argue that the search warrant for the second floor apartment was not supported by probable cause because Officer Purkiss did not corroborate the information given by the informant and because there has been no showing of the reliability of the informant. We are not persuaded.

As defendants point out, the officers obtained a search warrant from a magistrate judge who heard testimony from the confidential informant. Plaintiffs complain that about the fact that it turned out that Levarus had moved out of the second floor apartment five months earlier. But as defendants correctly point out, this argument overlooks the fact that the informant witnessed Levarus handling the two handguns in the second floor apartment. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("T]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). As part of their argument, plaintiffs complain that the officers did not check gas, electric, and phone company records, which supposedly would have showed that Levarus and his sister had switched apartments. However, plaintiffs offer no admissible evidence to show that the siblings, although switching apartments, in fact changed these records. Levarus moved into

---

evidence in support of a party's argument. Pl. Resp. Br. at 9 (citing *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006) and *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005)).

his parents' apartment on the first floor. Presumably their names would have been listed on these records.

**Search of the first floor.** Plaintiffs argue that the search of the first floor was unreasonable and broader than needed to be. *See* Resp. Br. at 15. Specifically, they allege that "the first floor was trashed, money was stolen and the officers remained far longer than was necessary even if their story were to be believed." *Id.* The statement quoted in the previous sentence is the sum total of plaintiffs' argument in their response brief. This argument is undeveloped and plaintiffs have provided little, if any, corroborating evidence. They also have not pointed to any case showing that it was clearly established that this type of search was broader than necessary. It is hard to even tell specifically what plaintiffs are claiming the officers did. The claim about money being taken is based on the testimony of Janet Richardson. She testified that her father told her the next day that he thought some money had been stolen from a pair of pants. He cannot say how much money he thinks was stolen. We find that this evidence is insufficient. We agree with defendants' assertion in their reply brief that this evidence is hearsay. *See* Defs. Reply Br. at 10, n.6. There is also a problem in determining which particular defendant could have taken the money.

**Detention of First Floor Occupants While the Search Was Conducted.** Plaintiffs argue that they were held in the first floor apartment for longer than necessary. Plaintiffs again rely on the *Jacobs* case. We find that it is factually distinguishable. The officers there had no probable cause and held a man for three hours while conducting a search. 215 F.3d at 772. There was nothing to suggest the man was potentially dangerous. By contrast, this seizure was a

half to a third less time; the officers had probable cause; and the facts known about Levarus Grayer provided a concrete basis for believing that an ambush attack could be launched.

**Excessive force.** Plaintiffs also complain that officers entered the first floor apartment with guns drawn. A fact dispute exists about how long the guns remained drawn, with the officers claiming they holstered their guns immediately and plaintiffs arguing that it could have been up to three minutes because that is the time they needed to find Levarus in the bedroom. But plaintiffs' inferential argument for why they believe guns remained drawn for three minutes undermines the argument that it was excessive. Specifically, plaintiffs concede that it would have been "reasonable" for officers to keep their guns drawn "until, at least, they found [Levarus]." (Pls. Resp. to Defs. Fact No. 65, p.15.) Three minutes is how long it took them to find Levarus (according to plaintiffs' version of the facts).

Plaintiffs again cite to *Jacobs* as a case factually on point, but we again find the differences are significant. There, the officers kept their guns pointed for over ten minutes, "even after ascertaining [the man] was not the person [they] were looking for." 215 F.3d at 773.[6]

The remaining arguments and claims were either not developed or fail for the reasons adequately explained in defendants' opening and reply briefs.

---

[6]As part of the excessive force claims, plaintiffs also allege that the handcuffs placed on some of them were too tight. However, in their response brief, they do not offer any arguments or authorities to support this claim. It is therefore waived.

## CONCLUSION

For the reasons set forth above, we grant defendants' motion for summary judgment on the federal claims. We also agree with the defendants' request that the state law claims be dismissed for lack of supplemental jurisdiction.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:**     March 16, 2010